UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| KIM E. LOTTINVILLE,<br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br>COMMISSIONER OF SOCIAL SECURITY,<br>Defendant. | C.A. No. 13-572-M-PAS |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Judge

Plaintiff Kim Eileen Lottinville brings this action for judicial review of the Social Security Commissioner's ("the Commissioner") final decision, as issued in accordance with the ruling of an Administrative Law Judge ("ALJ") denying her claim for Disability Income Benefits ("DIB") and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social Security Act. Ms. Lottinville seeks reversal or remand of the determination that she is not entitled to Social Security (ECF No. 7), while the Commissioner seeks an affirmance of the decision. (ECF No. 9). After a thorough review, this Court finds that substantial evidence supports the Commissioner's finding that Ms. Lottinville was not disabled during the relevant time period.

I. BACKGROUND

Ms. Lottinville is a high school graduate who has worked in the food service industry—including rolling silverware into napkins, as a prep cook, cleaning, plating desserts, and as a fast food cashier. (Tr. at 201, 197, 496-98).[1] Her reported daily activities include taking

---

[1] "Tr." refers to the "Transcript of Proceedings" filed in this case.

her son to work, either working or using the computer for email or games, cooking, and cleaning, and caring for her two cats. *Id.* at 212-14. Ms. Lottinville takes breaks during the day because of tiredness, and asks her son to help her with things that are too far over her head for her to reach or too heavy for her to carry. *Id.* at 214.

Ms. Lottinville reports having pain in her right shoulder, pain in her knees, a hearing impairment, and sleep apnea, as well as anxiety and depression. *Id.* at 196. She uses hearing aids and a sleep apnea machine. *Id.* at 235. She describes having restrictions with bending, standing, kneeling, and reaching; she can only walk a short distance; she has trouble concentrating and understanding due to anxiety and confusion. *Id.* at 236.

Ms. Lottinville was fifty-four years old on October 1, 2008, the date she contends that her disability rendered her unable to work. *Id.* at 133.

### A. Procedural History

On March 19, 2009, Ms. Lottinville filed an application seeking SSI and DIB benefits. *Id.* at 133-44. She listed the following illnesses, injuries, or conditions as limiting her ability to work: "[s]houlder injury, hearing impairment, sleep apnea, problems with knees, anxiety and depression." *Id.* at 196.

Her application was denied, she requested reconsideration, and it was denied upon reconsideration. *Id.* at 71-76. Then Ms. Lottinville requested a hearing before an ALJ. *Id.* at 77. Her hearing occurred in April of 2011. *Id.* at 25-53. Ms. Lottinville, who was represented by counsel, appeared and testified. *Id.* In addition, a vocational expert and two lay witnesses testified. *Id.*

Ms. Lottinville testified regarding her recent employment and the pain in her shoulder. *Id.* at 29-31. She stated that she took Tylenol for pain, Prozac for depression, and blood pressure

2

medication. *Id.* at 32. She testified about the pain in her knees, use of a knee brace, ice packs, and a heating pad. *Id.* at 34-35. She explained that she can only handle working three hours per week, and spends her other time watching television, sleeping, and doing some housework. *Id.* at 35. Her sons help her with laundry and cooking. *Id.* at 36. After her testimony, her older son's girlfriend testified, followed by her older son. *Id.* at 42-48. Finally, a vocational expert testified, answering numerous hypotheticals. *Id.* at 49-52.

Shortly after the hearing, in an April 26, 2011 decision, the ALJ found that Ms. Lottinville was not "under a disability within the meaning of the Social Security Act from October 1, 2008 through the date of this decision." *Id.* at 14-24. Ms. Lottinville then sought review of the ALJ's decision by the Appeals Council, but that request was denied. *Id.* at 1-3.

After the Appeals Council denied Ms. Lottinville's request for review, she filed suit in this Court seeking judicial review of the Commissioner's final decision denying her DIB and SSI applications. *Id.* at 532-33. The Commissioner, with Ms. Lottinville's consent, notified the Court that remand of the case was necessary to assess Ms. Lottinville's "ability to perform past relevant work." *Id.* at 538. (*Lottinville v. Astrue*, 11-cv-485-DLM, ECF No. 11). The Court remanded the case for such further administrative proceedings. *Id.* at 535-37, ECF No. 12, 13 in 11-cv-485.

In January 2013, a hearing was held before an ALJ; Ms. Lottinville, represented by counsel, testified, as did a vocational expert. *Id.* at 478-504. Ms. Lottinville testified regarding working a few hours a week at Olive Garden and living with her two sons. *Id.* at 483-84. Regarding her depression, she stated that she was not in counseling. *Id.* at 484. Ms. Lottinville explained that she could not work full-time because of pain in her shoulders, knees, hips, and trouble concentrating due to depression. *Id.* at 485. She stated that she was taking Naproxen for

her pain and medication for depression. *Id.* at 486-87. Ms. Lottinville testified that she drove, bathed and dressed herself, and cooked simple meals. *Id.* at 488-89. She stated that she used her computer about an hour a day to check email and play games, but loses concentration. *Id.* at 489. She said she could stand or sit for about 45 minutes to an hour, but gets stiff. *Id.* at 490. When asked if she could work more than three hours per week, Ms. Lottinville explained that she could not do it as she was having trouble just working the three hours and she did so to earn money to pay for her medications. *Id.* at 492. When asked if she could handle collecting money at a fast food restaurant, she explained that she cannot concentrate enough to make change. *Id.* at 494.

The ALJ reviewed with Ms. Lottinville details regarding her prior employment. *Id.* at 496-99. In response to hypothetical questions from the ALJ, the vocational expert testified about Ms. Lottinville working a drive through cashier or a prep cook, or in a variety of other unskilled jobs. *Id.* at 499. Ms. Lottinville's attorney questioned the vocational expert, adding to the hypothetical factors such as a moderately severe limitation in concentration. *Id.* at 502.

In a February 12, 2013 decision, the ALJ found Ms. Lottinville not disabled or entitled to receive DIB or SSI payments. *Id.* at 458-470. Ms. Lottinville filed a request for review of the ALJ's decision on remand, and the Appeals Council denied that request as untimely, rendering the ALJ's February 12, 2013 decision the final decision of the Commissioner. *Id.* at 448-54. Having satisfied her administrative remedies, *see* 42 U.S.C. § 405(g), Ms. Lottinville timely appealed the Commissioner's final decision by filing suit in this Court. (ECF No. 1).

B.     **Medical History**

In her application for SSI and DIB, Ms. Lottinville referenced shoulder injury, hearing impairment, sleep apnea, problems with knees, as well as anxiety and depression. (Tr. at 196).

4

Medical records before this Court pertain to each of these conditions. *See, e.g., id.* at 252-301; 321-857.

In August of 2005, at age 51, Ms. Lottinville underwent surgery for a tear in her right rotator cuff. *Id.* at 294. Dr. Belanger of Memorial Hospital performed the surgery. *Id.* In December of 2005, medical records indicate that Ms. Lottinville is "feeling better" and "eager to return to light duty work." *Id.* at 292. At a December 2006 appointment, Ms. Lottinville said that he shoulder felt "terrific" and she had to be careful not to lift excessively. *Id.* at 301. She reported no pain as long as she does not lift more than about ten pounds. *Id.* Ms. Lottinville also stated that she "is able to do her work without difficulty." *Id.*

In January of 2009, Ms. Lottinville visited Memorial Hospital in Pawtucket, R.I., twice regarding her shoulder and arm. She reported left shoulder pain after shoveling snow. *Id.* at 325. She was diagnosed with muscle strain and shoulder pain, and discharged with prescriptions for Flexeril, Motrin, and Vicodin. *Id.* at 326.

On April 27, 2009, Dr. William Palumbo examined an x-ray of her right shoulder as well as both knees. *Id.* at 330. Ms. Lottinville complained of chronic aches and pains in her right shoulder, occasional difficulty raising her right arm above shoulder level, and inability to carry more than ten to fifteen pounds with her right arm, though she could carry a gallon of milk. *Id.* at 333-35. Dr. Palumbo characterized Ms. Lottinville's 2005 right rotator cuff surgery as "rather successful," noting residual difficulty raising the right arm above shoulder level and carrying more than 15 pounds, but stated that "otherwise, she has done very well." *Id.* at 334. Regarding her knee pain, Dr. Palumbo stated that her obesity is causing a strain on both knees. *Id.*

The administrative record include a Physical Residual Functional Capacity Assessment form (a Physical "RFC" Assessment) dated May 1, 2009 completed by Dr. Alberto Tonelli. *Id.*

at 337-344. The RFC indicates that Ms. Lottinville could occasionally lift 20 pounds, frequently lift ten pounds, and sit or stand for about six hours during an eight hour work day. *Id.* at 338. Dr. Tonelli noted limitation in reaching as well as hearing, and an environmental limitation of noise. *Id.* at 340-41. Dr. Tonelli assessed Ms. Lottenville's reported symptoms as attributable to her medically determinable impairments, but indicated that the reported severity and effect of her reported symptoms was not consistent with the total medical and nonmedical evidence.[2] *Id.* at 342.

In May of 2009, Ms. Lottinville underwent a psychiatric consultative examination with State agency psychiatrist Dr. Jocelyn Kreiss. *Id.* at 345-48. Ms. Lottinville reported depression and nervousness beginning ten years prior, around the time of her divorce. *Id.* at 345. She reported that she frequently felt overwhelmed at work, and that financial problems were her primary stressor. *Id.* at 346. Ms. Lottinville told Dr. Kreiss that she could do household chores such as cooking, cleaning, and laundry; had a driver's license and drove without difficulty; and "spends most of her day either working or doing household chores." *Id.* Her reported hobbies were playing computer games and watching television, but she had decreased interest in activities that she used to enjoy. *Id.* at 347. Although she reported no friends and limited social support, Ms. Lottinville stated that she could get along with others in a work environment and socially. *Id.*

On August 24, 2009, State agency psychologist Michael Slavit, Ph.D., reviewed Ms. Lottinville's file and completed a Psychiatric Review Technique Form ("PRT") indicating that she had severe affective and anxiety-related disorders. *Id.* at 351-64. With respect to the so-

---

[2] On July 7, 2009, State agency reviewing physician Dr. Youssef Georgy reviewed Ms. Lottinville's updated file and affirmed Dr. Tonelli's assessment of her RFC. *Id.* at 350. Dr. Henry Laurelli reviewed and affirmed it as well. *Id.* at 369.

6

called "B" Criteria broad areas of functioning on the PRT, Dr. Slavit assessed mild restriction of activities of daily living and difficulties in maintaining social functioning, with moderate difficulties in maintaining concentration, persistence, or pace, and no extended episodes of decompensation. *Id.* at 361. Dr. Slavit also completed a Mental RFC Assessment form indicating that Ms. Lottinville had several moderate limitations, but, for the most part, was not significantly limited. *Id.* at 365-66. Dr. Slavit listed her diagnoses as social phobia and depression NOS (not otherwise specified).[3] *Id.* at 367.

On September 28, 2009, Ms. Lottinville started treatment with Dr. Mossab Bagegni of the Internal Medicine Center. *Id.* at 378. Dr. Bagegni treated Ms. Lottinville for Major Depressive Disorder, prescribing Prozac and referring her to a psychiatrist. *Id.* at 379-81. Dr. Bagegni also noted her ongoing complaints of knee, hip, elbow, and shoulder pain, recommending physical therapy, ice packs, and follow-up with Dr. Belanger. *See, e.g., id.* at 381-89, 413, 419, 427.

On November 5, 2010, Ms. Lottinville was seen at Memorial Hospital for right elbow pain without trauma for a week. *Id.* at 682-85. On examination, her gait was normal, both hands were normal, and range of motion was full and unrestricted in all joints despite tenderness in the right elbow. *Id.* at 684.

In November 2010, Ms. Lottinville told Dr. Bagegni that she had recently developed right elbow pain, with pain mainly on flexion. *Id.* at 432. Ms. Lottinville reported being "less depressed, on and off, has her days." *Id.* Three months later, Dr. Bagegni assessed that

---

[3] On January 20, 2010, State agency consultative reviewing psychologist Clifford Gordon, Ed.D., reviewed Ms. Lottinville's claim file to date and affirmed Dr. Slavit's assessment of her severe mental impairments and mental RFC. *Id.* at 370.

7

Ms. Lottinville's Major Depressive Disorder was "controlled with Prozac, [she was] not suicidal, [and] stable at this point." *Id.* at 435.

In March of 2011, Dr. Bagegni completed a Psychiatrist Review Technique form wherein he indicated that Ms. Lottinville's medical disposition meets listing 12.04, and he specified that her depressive syndrome was characterized by loss of interest, appetite disturbance, sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. *Id.* at 393-406. He further noted that her degree of limitation was marked in several areas. *Id.* at 403.

In April 2011, Dr. Bagegni again assessed Ms. Lottinville's Major Depressive Disorder as controlled by Prozac. *Id.* at 698. In May 2011, Dr. Bagegni assessed that her Major Depressive Disorder was "controlled," noting that she was "able to enjoy herself a bit more." *Id.* at 700.

On July 5, 2011, Dr. Teresa Slomka became Ms. Lottinville's new care provider. *Id.* at 702. Ms. Lottinville told Dr. Slomka that for about a week, she had left foot pain that with weight bearing; she had not noticed any erythema or swelling associated with the pain. *Id.* Ms. Lottinville denied suicidal thoughts or ideations, stating that she had "good days and bad days equally." *Id.* On examination, Ms. Lottinville was well appearing; her left foot was not tender on palpation, range of motion was intact and not painful; and her mood and affect were appropriate. *Id.* at 703. With respect to depression, Dr. Slomka noted that Ms. Lottinville was "[w]ell controlled on current regimen . . . [patient] has had counselling in the past but states that currently she feels fine and does not need it." *Id.* at 704.

In October 2011, Ms. Lottinville returned to Dr. Slomka reporting increased depression for the last couple of weeks associated with recent events, including her mother being in the

hospital, and the denial of her disability benefits request. *Id.* at 713. Dr. Slomka assessed that her Major Depressive Disorder as "well controlled with current dose of antidepressant, which we will continue." *Id.*

The record contains several reports dated January 2012. *Id.* at 646-72. In a Disability Report, Ms. Lottinville indicates that she suffers from a shoulder injury, hearing impairment, sleep apnea, depression, anxiety, knee pain and hip pain. *Id.* at 647. In a Work History Report, Ms. Lottinville provides details regarding her duties at various jobs. *Id.* at 657-664. In a Function Report, she notes continued shoulder pain, poor sleep, constantly feeling tired, and the inability to lift, reach, or pull. *Id.* at 665. She states that she feeds her two cats, checks email, plays games, and takes her son to work, but has trouble with depression, anxiety, reaching, and combing her hair. *Id.* at 666. She makes her bed, washes dishes, folds laundry, but needs to take breaks while doing these chores. *Id.* at 667. She reported that knee pain limits her walking to short distances and she has anxiety attacks. *Id.* at 670, 671.

In February 2012, Ms. Lottinville returned to Dr. Slomka with chief complaints of "depression and acute grief" related to her mother's death in October. *Id.* at 718. Ms. Lottinville had attended two sessions of a joint group therapy for acute grief; she felt the meetings were helpful and that she would continue to attend them. *Id.*

In April 2012, Ms. Lottinville underwent a consultative psychological examination with State agency examiner Wendy Schwartz, Ph.D. *Id.* at 725-31. Ms. Lottinville told Dr. Schwartz that she had socially isolated herself, had persistent feelings of hopelessness and helplessness, cried most days, and was chronically irritable, with low motivation and mild problems with short-term memory and concentration. *Id.* at 727. She reported daily activities of driving her

9

son to and from work, watching TV, playing computer games, and napping; she stated that she "does most of the cooking and cleaning and goes shopping with her son." *Id.* at 728.

Dr. Schwartz noted that Ms. Lottinville needed to be redirected numerous times and tended to have difficulty sustaining focus, "although it was unclear whether this may had [sic] to do with her hearing issues." *Id.* at 729. Ms. Lottinville reported moderate impairments in her ability to complete everyday household routine tasks "primarily with regard to standing, stating that she can only stand for an hour or two." *Id.* Dr. Schwartz assessed Major Depressive Disorder, Recurrent, Moderate and Panic Disorder without Agoraphobia. *Id.* at 730. She felt that Ms. Lottinville's functional limitation appeared to be due to physical issues, and that her ability to understand, remember, and follow directions appeared to be mildly impaired at most. *Id.* Her ability to respond appropriately to customary work pressures, colleagues, and supervisors appeared to be mildly to moderately impaired, and she appeared to be moderately socially impaired. *Id.*

In June 2012, Ms. Lottinville told Dr. Slomka that her knee pain and right hip pain with walking had worsened over the last few weeks. *Id.* at 774. Dr. Slomka suspected osteoarthritis and ordered x-rays of Ms. Lottinville's knees and right hip. *Id.* at 775. Her depression was noted to be stable, although she continued to feel sad and tearful when remembering her mother. *Id.* at 774. A July 2012 x-ray of Ms. Lottinville's left knee showed mild degenerative changes. *Id.* at 781. An x-ray of her right knee was normal, as was an X-ray of her right hip. *Id.* at 782, 783.

In July 2012, Ms. Lottinville underwent another consultative physical examination with State agency examiner Dr. Jay Burstein. *Id.* at 734-5. Dr. Burstein assessed bilateral knee pain, osteoarthritis of the left knee, bilateral hip pain, right shoulder pain, and a right shoulder surgical

10

repair. *Id.* at 735. He assessed her functional limitations, indicating that she was limited for prolonged standing and walking without appropriate rest breaks and for squatting and kneeling, though she was capable of gripping, grasping, performing motor-coordinated activities, and lifting/carrying up to 30-35 pounds. *Id.*

In August 2012, Ms. Lottinville told Dr. Slomka that the pain in both knees and her right hip was "pretty well controlled with Tylenol." *Id.* at 787. Dr. Slomka indicated that Ms. Lottinville's depression was stable and indicated Ms. Lottinville would continue with Tylenol for pain, and recommended weight loss. *Id.*

On September 1, 2012, Ms. Lottinville went to Memorial Hospital with left shoulder pain; she caught herself when she felt like her knee was giving out on the stairs. *Id.* at 818. An x-ray of her left shoulder was normal. *Id.* at 819. She was discharged with an arm sling and instructions to take ibuprofen as needed and to ice the shoulder. *Id.* at 820. Two and a half weeks later, she returned to Memorial Hospital after missing a step and twisting her left knee. *Id.* at 812. The x-ray was negative for any acute fracture; she discharged with crutches, a knee immobilizer, and told to take ibuprofen and use ice. *Id.* at 815-6.

In October 2012, Ms. Lottinville returned to Dr. Slomka reporting that she was depressed because of her current life circumstances, including the one-year anniversary of her mother's death, her car being towed, her son's girlfriend having an accident in her car, and concern about her son abusing alcohol. *Id.* at 794. She also complained of right knee pain. *Id.* An October 2012 x-ray of Ms. Lottinville's left knee did not show a facture. *Id.* at 792, 796.

In November 2012, Ms. Lottinville saw Dr. James Hedde, DO, an orthopedic. *Id.* at 802. Ms. Lottinville elected treatment with physical therapy for her shoulder and knee rather than injections. *Id.*

C.     The ALJ's Decision

Following the requisite five steps, the ALJ found that (1) Ms. Lottinville had not engaged in substantial gainful employment since October 1, 2008, the alleged onset date of her disability (Tr. at 459); (2) Ms. Lottinville had medically determinable impairments, or a combination of impairments, that are severe, *id.* at 459, 461; (3) Ms. Lottinville did not have an impairment or combination of impairments that met or was medically equal to one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, *id.* at 460-462; and (4) Ms. Lottinville has the residual function capacity to perform past relevant work. *Id.* at 460, 469. Because the ALJ found Ms. Lottinville capable of performing past relevant work, there was no need to proceed to step five to determine whether Ms. Lottinville has the capacity to do other work that exists in significant numbers in the national economy. *Id.* at 460.[4]

Regarding step twon, the ALJ found that Ms. Lottinville had "the following severe impairments: depressive disorder; right shoulder pain status post-surgery in 2005; bilateral knee pain; bilateral hearing loss with hearing aids." *Id.* at 461. The ALJ explained that "[t]hese impairments cause a more than slight restriction on [Ms. Lottinville's] ability to perform basic work-related activities." *Id.* In addition, the ALJ noted that Ms. Lottinville received treatment for additional complaints such as pain from shoveling snow and sleep apnea, and classified these impairments as non-severe. *Id.*

Regarding step four, the ALJ found that Ms. Lottinville "is capable of performing past relevant work as a cashier, prep cook, laundry attendant and sandwich maker." *Id.* at 469. Prior to making this determination, the ALJ considered all symptoms and opinion evidence, and

---

[4] In the prior ALJ decision dated April 26, 2011, the ALJ found that Ms. Lottinville "has the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b) and 416.967(b)," with several exceptions. *Id.* at 18.

concluded that Ms. Lottinville "has the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b) and 416.967(b)," with the following exceptions: "occasional crawling, crouching, stooping, kneeling, balancing, and climbing; occasional overhead reaching with the right upper extremity; a need to avoid concentrated exposure to a noise; and a moderate limitation in concentration, persistence, and pace such that she can understand, remember, and carry out simple, familiar, repetitive 1-2-3 consistent step tasks." *Id.* at 463. The ALJ found that Ms. Lottinville's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." *Id.* at 464.

Finally, the ALJ concluded that Ms. Lottinville "has not been under a disability, as defined in the Social Security Act, from October 1, 2008, through the date of this decision." *Id.* at 470.

## II. STANDARD OF REVIEW

"The Social Security Act specifically mandates that "'[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.'" *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981) (quoting 42 U.S.C. § 405(g)). A court "must uphold the Secretary's findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Id.* "It is the responsibility of the Secretary to determine issues of credibility and to draw inferences from the record evidence. *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (citing *Rodriguez*, 647 F.2d at 222). "Indeed, the resolution of conflicts in the evidence is for the Secretary, not the courts." *Id.*

# III. ANALYSIS

Ms. Lottinville argues that the final decision that she was not disabled and therefore not entitled to SSI and DIB was erroneous and contrary to federal law for two main reasons. (ECF No. 7). First, she asserts that the ALJ's conclusion that she can return to her former work was not based on substantial evidence. *Id.* at 6-16. Second, she asserts that even if ones accepts the ALJ's finding as to the RFC, arguendo, as valid, she would be entitled to benefits as of her fifty-fifth birthday based on the Social Security Regulations, 20 C.F.R. § 404, Subpart P, Appendix 2, Rule 202.04. *Id.* at 17-18. The Commissioner disagrees and seeks affirmance of the final decision because substantial evidence supports the finding that Ms. Lottinville was not disabled during the relevant time period. (ECF No. 9).

## A. Substantial Evidence

Ms. Lottinville argues that the ALJ's determination that she can return to work is unsupported by substantial evidence. (ECF No. 7 at 6-16). She makes several claims of error. First, she contends that her impairments must be evaluated in combination under Social Security Ruling 86-8, but the ALJ failed to do so, instead "isolating and minimalizing each impairment" individually. *Id.* at 8. She also argues that the ALJ's findings at the fourth step are wrong, contrary to evidence, and not based on evidence. *Id.* Within this argument, she asserts that the ALJ erred in assessing her credibility and subjective complaints. *Id.* at 10-12. Finally, Ms. Lottinville alleges error in the ALJ's use of hypotheticals with the vocational expert. *Id.* at 13-16.

### 1. Combination of Impairments

Ms. Lottinville contends that the ALJ was "isolating and minimizing each impairment . . . depriving the claimant of consideration of the possible combined effects of her difficulties." (*Id.*

at 8). Ms. Lottinville recognizes that many of her impairments, when analyzed individually, may not by themselves disable her, but she asserts that the combination of her severe impairments "render her disabled from all substantial gainful activity." *Id.*

In the February 13, 2013 decision, the ALJ recognizes the responsibility to consider the claimant's "*combination of impairments*" and then concludes that Ms. Lottinville "does not have an impairment or *combination of impairments* that meets or medically equals the severity of one of the listed impairments . . . ." (Tr. at 460, 461 (emphasis added)). In support of this conclusion, the ALJ reviewed Ms. Lottinville's impairments and limitations separately. *Id.* at 461-463.

The Commissioner argues that the ALJ's recognition that impairments must be considered in combination and review of each impairment separately "was sufficient to fulfill the Commissioner's obligations under Social Security Ruling SSR 86-8." (ECF No. 9 at 22). The Commissioner relies on *Viveiros v. Astrue*, No. 06-419T, 2009 WL 196217, at *5 (D.R.I. Jan. 23, 2009) and cases cited therein. *Id.* at 21-22. In *Viveiros*, the Court declined to infer that the ALJ's consideration of the claimant's impairments individually implied that the ALJ did not consider the impairments in combination. 2009 WL 196217, at *5.

Social Security Ruling 86-8 explains that

> When assessing the *severity of multiple impairments*, the adjudicator must evaluate the combined impact of those impairments on an individual's ability to function, rather than assess separately the contribution of each impairment to the restriction of function as if each impairment existed alone. When multiple impairments, considered in combination, would have more than a minimal effect on the ability to perform basic work activities, adjudication must continue through the sequential evaluation process.

15

(Emphasis added). Here, like in *Vivieros*, the claimant has multiple impairments. (Tr. at 461). Also like in *Vivieros*, the ALJ both noted the requirement that the impairments be considered in combination and concluded that no combination of impairments was medically equal to the severity of a listed impairment. *Id.* at 460, 461. Similarly, in *Snow v. Barnhart*, the court found that an "ALJ's comprehensive discussion of [the claimant's] physical and mental impairments" "may show adequate consideration of the combined effect of a claimant's impairments despite the fact that the impairments are discussed individually rather than collectively." No. 05-11878, 2006 WL 3437400, at *6 (D. Mass. Nov. 29, 2006) (citing *Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987)); *see also Gaudet v. Astrue*, No 11-11894, 2012 WL 2589342, at * 7 (D.Mass. July 5, 2012) (finding that "the ALJ discussed each of Gaudet's four severe impairments . . . in significant enough detail to satisfy SSR 86–8").

Here, the ALJ conducted a comprehensive review of Ms. Lottinville's impairments. This Court will not infer that the ALJ failed to follow the recognized rule of considering impairments in combination simply because the ALJ discussed her impairments separately.

### 2. Step Four

At Step 4, the ALJ determined that Ms. Lottinville "is capable of performing past relevant work as a cashier, prep cook, laundry attendant and sandwich maker." (Tr. at 469). Ms. Lottinville contends that the ALJ's determination that she can do her former work was "clearly wrong." (ECF No. 7 at 8). This Court must affirm the Commissioner's decision if supported by substantial record evidence. *See Rodriguez*, 647 F.2d at 222.

While Ms. Lottinville points to evidence of her depressive disorder and functional limitations, there is abundant record evidence supporting the ALJ's conclusion. Regarding the ALJ's decision not to accord Dr. Bagegni's assessment significant probative value, the ALJ

explained why: Dr. Bagegni's contemporaneously recorded treatments notes were persistently negative for any significant abnormalities and Ms. Lottinville was regularly prescribed only over the counter medications for her complaints. (Tr. at 468). In addition, examinations by Drs. Burstein and Schwartz indicated that Ms. Lottinville had significantly greater capabilities than those reported by Dr. Bagegni. *Id.* It is for the ALJ, not this Court, to resolve evidentiary conflicts. *See Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987) (resolution of conflicts in the evidence is for the Secretary).

Regarding Ms. Lottinville's credibility, that too is for the ALJ to assess. *See Rodriguez v. Celebrezze*, 349 F.2d 494, 496 (1st Cir. 1965) ("Issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary.") "The credibility determination by the ALJ, who observed the claimant, evaluated his [or her] demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." *Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987). Regarding her subjective complaints, the ALJ considered Ms. Lottinville's daily activities, medications, and course of treatment. (Tr. at 464-69). There is ample evidence indicating that Ms. Lottinville participated in a wide range of activities and household chores. Her physical pain was treated with over-the-counter medications. Her depression was controlled with medications and she was not in counseling. The ALJ found that Ms. Lottinville's courses of treatment and activities contradicted her subjective complaints. In this case, the ALJ made specific findings supporting the conclusion that Ms. Lottinville's subjective complaints were not fully credible and that conclusion is entitled to substantial deference.

### 3. Vocational Expert

Ms. Lottinville contends that the hypothetical posed to the vocational expert failed to accurately reflect her functional limitations. ECF No. 7 at 13-16. The crux of this argument appears to be Ms. Lottinville's contention that her impairments are more severe than recognized by the ALJ, so the hypotheticals were flawed because they did not accurately reflect her limitations. Further, Ms. Lottinville contends that when the hypotheticals contained limitations more akin to her own, the vocational experts found that no jobs would be available.

The Commissioner responds that this argument simply reframes Ms. Lottinville's arguments against the ALJ's assessment of her RFC. ECF No. 9 at 30-32. This Court agrees. The ALJ's assessment of Ms. Lottinville's RFC is supported by substantial evidence and therefore the corresponding hypotheticals were not flawed.

### B.     Advanced Age

Ms. Lottinville contends that when she became 55 years old in March of 2009 she became entitled to benefits because of her "advanced age" under Rule 202.04 in Appendix 2 to Subpart P of Part 404. (ECF No. 7 at 17-18). The Commissioner asserts that those rules may be relied on at Step 5, but are irrelevant here because the ALJ never reached Step 5 when evaluating Ms. Lottinville's claim. (ECF No. 9 at 32-34). Ms. Lottinville did not respond to the Commissioner's argument.

The ALJ concluded at Step 4 that Ms. Lottinville is capable of performing past relevant work and therefore is not disabled. (Tr. at 469). As explained *supra*, this determination is supported by substantial evidence. Consequently, this Court need not consider advanced-age rules pertaining to Step 5.

## IV. CONCLUSION

Ms. Lottinville's Motion to Reverse is DENIED (ECF No. 7) and the Commissioner's Motion to Affirm is GRANTED. (ECF No. 9).

IT IS SO ORDERED.

John J. McConnell, Jr.
United States District Judge

September 15, 2014